KIRTMAN, ADMINISTRATOR ETC., ET AL. *v.* GALLENTINE

[No. 19,240. Filed September 6, 1960. Rehearing dismissed
October 6, 1960.]

*Herrod Carr,* of Greensburg, for appellants.

*Ronald Beard,* of Greensburg, for appellee.

MYERS, J.—This appeal results from certain probate proceedings in the Decatur Circuit Court wherein Arthur W. Kirtman as Administrator of the Estate of Minnie J. Gallentine (hereinafter called Minnie), Deceased, filed a final report in which he charged appellee, George Gallentine, the surviving husband (hereinafter called George), with the funeral expenses of his deceased wife which had been previously paid. Appellee filed objections to the final report, which the court sustained, holding that George's share of the estate should not be charged with such expenses.

From the record it appears that Minnie previously had been married to Arthur A. Kirtman, by whom she had four children, being Arthur W. Kirtman, Wilmer D. Kirtman (referred to in the title of the assignment of errors as William D. Kirtman), Enoch W. Kirtman (referred to in the title of the assignment of errors as Clarence W. Kirtman), and Rosemary Conner, appellants herein. These children were all adults and married at the time of this action. Arthur A. Kirtman and Minnie were divorced and subsequently she married the appellee herein. Her former husband also remarried, his wife being known as Doris R. Kirtman. Some time during the year 1951, the evidence is not clear concerning the date, George and Minnie separated, and after making a settlement with her, George went to Arkansas and they were divorced. However, at her insistence, in August, 1952, one of her sons drove out to Arkansas and brought him back to her home where they were

remarried. They lived together as husband and wife thereafter until November 13, 1952, at which time she died.

During their last marriage George and Minnie lived in a house owned by Minnie in Milford, Indiana. She also owned a farm of about 66 acres near Hartsville which he had farmed for her. After they were remarried, George went to work in Shelbyville and gave her his pay checks in order to pay bills. Following her death he continued to live in her house for approximately a year. He paid no rent, but did pay property taxes and mortgage obligations during that time. Arthur W. Kirtman, one of her sons, testified that he was permitted to live there without any agreement.

It seems that on June 2, 1952, after Minnie's divorce from George, and before her remarriage, as a single woman, she executed a contract to sell, in writing, wherein she sold her farm on contract to her former husband, Arthur A. Kirtman, and his wife, Doris, who agreed to purchase it for the sum of $4,000, paying $100 down, and to pay $50 a month thereafter until the full purchase price had been paid, with interest at the rate of six per cent. per annum. The first payment was made July 5, 1952.

Minnie died intestate and no estate was opened immediately after her death. Her remains had been taken to the Funeral Home of Wenning & Porter in Greensburg, Indiana. Arthur W. Kirtman testified that the estate had not been opened yet and none of the children or George had any money to pay the funeral expenses. The four children and George got together and agreed that they would assign the real estate contract to the Funeral Home in order to pay the funeral expenses. This agreement was reduced to writing and signed by George, Minnie's three sons and their wives, her daugh-

ter and her husband, and Wenning & Porter, the funeral establishment. It reads as follows:

"ASSIGNMENT OF INTEREST IN REAL ESTATE CONTRACT

"Whereas, on June 2nd, 1952, Minnie J. Gallentine was the owner in fee simple of the following described real estate situate in Decatur County, Indiana, to-wit:

"The North half of the Northeast quarter of Section Five (5), Township Nine (9) North, Range Eight (8) East, containing 66.66 acres more or less,

"And whereas, on said last named date, the said Minnie J. Gallentine entered into a real estate contract with Arthur A. Kirtman and Doris R. Kirtman, husband and wife, whereby the said Kirtmans agreed to purchase said above described real estate for the sum of Four Thousand ($4,000.00) Dollars, paying One Hundred ($100.00) Dollars down and paying thereafter Fifty ($50.00) Dollars per month on the 5th day of each month, beginning July 5, 1952, until the full purchase price is paid, together with interest at the rate of six percent (6%) per annum, payable semi-annually on the unpaid principal.

"And whereas the said Minnie J. Gallentine died on the ___ day of November, 1952.

"Now therefore, the undersigned, the sole and only heirs at law of the said Minnie J. Gallentine, and being George Gallentine, her husband, Arthur W. Kirtman, Wilmer D. Kirtman and Enoch W. Kirtman, her sons, and Rosemary Conner, her daughter, do hereby transfer, assign and set over said above described real estate contract to Wenning & Porter, of Greensburg, Indiana, for the following uses and purposes: the funeral expenses of the said Minnie J. Gallentine, owed to the said Wenning & Porter by the said heirs of Minnie J. Gallentine, deceased, amount to the sum of Nine Hundred Twenty ($920.00) Dollars, and said payments, including interest, shall be applied against these funeral expenses.

"It is agreed that the said Wenning & Porter shall retain said real estate contract and collect all payments as the same become due, including interest payments, and apply said payments upon the said funeral expenses and after said funeral expenses have been paid in full, then said Wenning & Porter shall reassign said contract back to said heirs.

"It is further agreed that the said Arthur A. Kirtman and Doris R. Kirtman, husband and wife, have been notified of this assignment and that they have agreed to make payments as herein set out.

"It is further agreed that this agreement shall be binding upon the heirs of said Minnie J. Gallentine and their respective wives and husband.

"IN WITNESS WHEREOF, the parties have hereunto set their hands in triplicate the day and date first above written.

"*George H. Gallentine*
GEORGE GALLENTINE, unmarried

"*Arthur W. Kirtman*   "*Christine Kirtman*
ARTHUR W. KIRTMAN

"*Wilmer D. Kirtman*   "*Nancy G. Kirtman*
WILMER D. KIRTMAN

"*Enoch W. Kirtman*   "*Lenora Kirtman*
ENOCH W. KIRTMAN

"*Rosemary Conner*   "*William Conner*
ROSEMARY CONNER

"*Wenning & Porter*
WENNING & PORTER
"By J. P. Porter"

There is no date on this agreement, nor does the record indicate when it was signed. However, since the Funeral Home acknowledged the first payment of $50 on December 1, 1952, it could be reasonably inferred that it was executed some time shortly after Minnie's death.

Appellee's Exhibit "C" purports to be a receipt for payments made to the Funeral Home, covering a period from December 1, 1952, to May 1, 1954, showing a total of $920 having been paid. These were the charges for Minnie's funeral and were shown to have been paid in full. Appellee's Exhibit "D" purports to be a copy of the written agreement for the purchase of a granite headstone for Minnie's grave, between the monument dealer and Arthur W. Kirtman, in the amount of $286. It was dated October 3, 1956. There was testimony that this was paid from the assets of Minnie's estate.

The record shows that Arthur A. Kirtman made regular payments to the Funeral Home for a period of about one and one-half years, until $920 had been paid. In the meantime, on November 30, 1953, his son, Arthur W. Kirtman, was appointed and qualified as Administrator of Minnie's estate. Arthur A. Kirtman made a few more payments on the real estate contract to his son as Administrator. After that, Arthur W. Kirtman testified that his father abandoned the contract and "forfeited the payments he had made on it." Arthur W. Kirtman, as Administrator, petitioned to sell the land as an asset of the estate, and it was subsequently sold for $1,500, which proceeds were credited to the estate.

On December 29, 1956, the Administrator filed his final account in which he asked that the funeral expenses and cost of the monument be charged against George's interest in the estate. As the estate was a very small one, it meant that George would receive nothing as his share. George filed objections to this final accounting in which he stated (1) that the funeral expenses had been paid in full by Arthur A. Kirtman, who was a stranger to the estate; and (2) that there had been an agreement between the heirs of the estate that

the expenses were to be paid from real estate and were thus to be shared equally. The Administrator answered these objections in general denial, further saying there never had been any agreement with George that he would not be held liable.

,The cause being at issue was submitted to the court for trial without the intervention of a jury. There was a finding in favor of appellee, and judgment was entered disapproving the final accounting and ordering that it be resubmitted to show distribution to the appellee and other heirs in accordance with the laws of descent, and without charging against appellee's share the item of $920 funeral expenses.

Appellants filed a timely motion for new trial in which they stated that the decision was not sustained by sufficient evidence and was contrary to law. In their motion they also set forth as "errors of law occurring at the trial" a lengthy narrative of the facts as appellants viewed them, together with alleged holdings and conclusions of the court in regard thereto. This part of the motion is at most argumentative and repetitious and as such cannot be a valid ground for new trial.

Since this was a negative judgment, in that the decision did not give appellants the affirmative relief they requested, the only question presented is that the decision is contrary to law. It cannot be attacked on the ground that there was a lack of evidence to sustain it. Flanagan, Wiltrout and Hamilton's Indiana Trial and Appellate Practice, §1812, Comment 6 (1958 Supp.), and cases cited therein.

The principal arguments made by appellants substantially are as follows: (1) There was no evidence to show that there was any agreement between George and the other heirs whereby George was to be relieved of

paying his wife's funeral expenses, or that his interest in the estate was not to be charged with monies paid for such expenses; (2) George was under a common-law liability as a husband to pay his wife's funeral expenses; and (3) the agreement signed by the heirs did not waive their right to their distributive share of the estate subject to the Administrator's duty to retain and collect from George the funeral expenses previously paid from assets of the estate.

By statute, in 1952, the expense of the funeral of a deceased was a preferred claim against an estate. Former Burns' Ind. Stat. 1933, §6-1301. Pursuant to the provisions of the new Indiana Probate Code, put into effect in 1954, reasonable funeral expenses constitute a preferred claim. Burns' Ind. Stat., § 7-809. However, it has been held that this statute, being specifically the law applicable prior to the adoption of the new Probate Code, did not relieve a husband from his common-law liability of the burial expenses of his deceased wife. *Rocap, Exr.* v. *Blackwell* (1923), 79 Ind. App. 232, 235, 237; 153 N. E. 515, 516, 517. In this case the court said as follows:

> "The common law imposes upon the husband the duty to support his wife, and, upon her death, to provide for her body a decent burial. That duty arises out of the marital relation and is referable to considerations of natural justice and public policy. It originates at the time of the marriage. It is a continuing duty and cannot be fulfilled until the last act of piety has been performed. Any attempt to treat the duty of a husband to support his wife as being a duty separate and distinct from the duty to bury her lifeless body *in a manner suitable to his estate and station in life* serves only to confuse." (Our emphasis.)

The court further said:

"Nevertheless, the husband's common-law liability has not been abrogated. *Scott* v. *Carothers* (1897), 17 Ind. App. 673, 47 N. E. 389. *But where the wife leaves an estate the husband's liability becomes secondary.*" (Our emphasis.)

In the case of *Phillips, Admr.* v. *Tribbey* (1924), 82 Ind. App. 68, 74, 141 N. E. 262, 263, 144 N. E. 145, 861, the court said as follows:

"It seems clear to us that in whatever form the question may arise in this State, with the common law still in force on the subject under consideration, as we have held, the ultimate liability for the funeral expenses of a deceased wife rests on the surviving husband, *unless relieved therefrom by some contractual or testamentary provision.*" (Our emphasis.)

From the above it can be seen that the common-law duty upon a husband to pay for his wife's funeral expenses is subject to certain qualifications, which are (1) that he has the duty to bury her in a manner suitable to *his* estate and station in life; (2) that this liability becomes secondary if the wife leaves an estate; and (3) that the liability may be relieved by a contractual or testamentary provision. Therefore, the common-law duty imposed upon a husband is not absolute. The record herein reveals that George had no money or wherewithal to pay the funeral expenses. If he had buried his wife in a manner suitable to his estate, she would have had a pauper's funeral. The record further reveals that she died leaving a solvent estate consisting of real property subject to a purchase agreement. Furthermore, there was a contract between George and the heirs as set forth previously in this opinion.

The funeral debt was paid in full, and, in so far as Wenning & Porter were concerned, it was completely discharged. Because of his own personal situation, and the fact that his wife died leaving a sufficient estate to pay not only all funeral expenses but other debts, it is clearly indicated that George's liability to pay those funeral expenses was secondary. When the primary debt was discharged, his only secondary liability was likewise discharged. The written agreement went one step further in relieving George of his liability.

This was in the nature of a family settlement in so far as the funeral expenses were concerned. It is not mandatory under our present existing Probate Code, nor was it so at the time of the commencement of the original action herein, that an estate must be administered by means of court proceedings. Following the death of a decedent, heirs and legatees may dispense with statutory formalities for the settlement of an estate by agreement among themselves. Such agreements are favored at law and will be upheld in the absence of fraud or mistake. *Shuee et al.* v. *Shuee* (1885), 100 Ind. 477; *Brown et al.* v. *Brown et al.* (1894), 139 Ind. 653, 39 N. E. 152; *Cornet* v. *Guedelhoefer* (1941), 219 Ind. 200, 36 N. E. 2d 933, 37 N. E. 2d 681; *Bowen et al.* v. *Stewart, Administrator* (1891), 128 Ind. 507, 515, 26 N. E. 168, 28 N. E. 73.

When the Administrator was appointed he took the estate subject to this agreement and the subsequent payment of the funeral expenses. When the Funeral Home was paid in full, it was done without any effort on his part as Administrator. Under these circumstances, neither he as Administrator nor the children as heirs have any right of subrogation as against George, as his liability to pay the funeral ex-

penses was fully discharged under the circumstances as we have already set forth. The fact that the children did not agree to release him from this liability is of no consequence. Thus, George's share in the estate is not subject to any charge for funeral expenses previously paid.

Judgment affirmed.

Ax, P. J., and Cooper and Ryan, JJ., concur.

NOTE.—Reported in 169 N. E. 2d 1.